UNITED STATES of America, Plaintiff,

v.

NORTHEASTERN PHARMACEUTICAL AND CHEMICAL COMPANY, INC., et al., Defendants.

No. 80–5066–CV–S–4.

United States District Court, W.D. Missouri, S.D.

Jan. 31, 1984.

Vernon Poschel, Asst. U.S. Atty., Kansas City, Mo., John R. Barker, Environmental Enforcement Section, Dept. of Justice, Washington, D.C., Dan Shiel, E.P.A., Kansas City, Mo., James Kohanek, E.P.A., Washington, D.C., for plaintiff.

Ted L. Perryman, Roberts & Heneghan, Inc., St. Louis, Mo., for defendant Northeastern Pharmaceutical, Michaels & Lee.

Howard Holtzmann, Holtzmann, Wise & Shepard, New York City, John C. Noonan, Stinson, Mag & Fizzell, Kansas City, Mo., for defendant Syntex Agribusiness.

Ronald Mills, pro se.

RUSSELL G. CLARK, Chief Judge.

### INDEX TO MEMORANDUM OPINION

| | PAGE NO. |
|---|---|
| Summary of Issues | 826 |
| Summary of Conclusions of Law | 827 |
| Initial Findings of Fact | 827 |
| The NEPACCO Manufacturing Process | 828 |
| Disposal of Hazardous Waste at NEPACCO | 829 |
| Governmental Response | 830 |
| Endangerment to Health and the Environment | 832 |
| I. Section 7003 of the Resource Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C. § 6973 (1980) | 833 |
| II. Sections 104, 106(a) and 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of 1980, 42 U.S.C. §§ 9604, 9606(a) and 9607(a) | 838 |
| A. Retroactive Application of CERCLA to Non-Negligent Past Off-Site Generators and Transporters | 839 |
| | PAGE NO. |
| B. Standard of Liability—Strict Liability | 843 |
| C. Joint and Several Liability | 844 |
| D. Imminent and Substantial Endangerment—Section 106(a), 42 U.S.C. § 9606(a) | 845 |
| III. Liability of the Defendants | 846 |
| Mills | 846 |
| NEPACCO | 847 |
| Lee | 847 |
| Michaels | 849 |
| IV. Recoverable Response Costs | 850 |

## MEMORANDUM OPINION

The plaintiff instituted this action on August 1, 1980 and filed an amended complaint on August 19, 1982 seeking injunctive relief and reimbursement of all costs incurred in performing certain remedial and removal actions at the Denney farm site, near Verona, Missouri, pursuant to section 7003 of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6973, and sections 104, 106(a) and 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9604, 9606(a) and 9607(a). The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345; 42 U.S.C. § 6973, and 42 U.S.C. §§ 9604, 9606(a), and 9613(b).

### Summary of Issues

The Court considered the following issues:

1. Whether section 7003 of RCRA or sections 104, 106(a) and 107(a) of CERCLA apply retroactively to hold past non-negligent off-site generators and transporters liable for the costs incurred in the cleanup of an inactive or abandoned hazardous waste disposal site?

2. Whether sections 104, 106(a) and 107(a) of CERCLA apply retroactively to hold past non-negligent off-site generators and transporters liable for response costs incurred prior to the enactment of CERCLA?

3. If CERCLA is to be applied retroactively, does it violate the Fifth Amendment Due Process Clause of the United States Constitution?

4. What standard of liability should be imposed under CERCLA—strict liability or negligence?

5. If the defendants are liable, whether joint and several liability should be imposed?

6. Whether the Denney farm disposal site presented an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from the site?

7. Whether these specific defendants are liable under the provisions of CERCLA?

8. If the defendants are liable under CERCLA, what costs are recoverable by plaintiff?

*Summary of Conclusions of Law*

The Court finds that:

1. Section 7003 of RCRA does not apply retroactively to past non-negligent off-site generators and transporters.

2. Sections 104, 106(a) and 107(a) of CERCLA do apply retroactively to past non-negligent off-site generators and transporters.

3. Sections 104, 106(a) and 107(a) of CERCLA do not apply retroactively to response costs incurred prior to December 11, 1980.

4. CERCLA does not violate the Fifth Amendment Due Process Clause.

5. The standard to be applied in determining liability under CERCLA is strict liability.

6. CERCLA allows for the imposition of joint and several liability.

7. The Denney farm site presented an imminent and substantial endangerment to the public health, welfare and the environment.

8. All four defendants are jointly and severally liable pursuant to CERCLA for all costs incurred by the plaintiff after December 10, 1980, including costs for salaries, expenses and attorney fees.

9. All four defendants are jointly and severally liable for prejudgment interest at the rate of 9% per annum calculated from August 19, 1982, as well as, all future costs of removal or remedial action incurred by the plaintiff not inconsistent with the national contingency plan.

INITIAL FINDINGS OF FACT

 Defendant Northeastern Pharmaceutical and Chemical Co., Inc. (NEPACCO) is a corporation incorporated in 1966 under the laws of Delaware with its principal office in Stamford, Connecticut. NEPACCO's corporate charter was forfeited by the Delaware Secretary of State on August 22, 1976, for failure to maintain an agent for service of process. NEPACCO never filed a certificate of voluntary dissolution with the Delaware Secretary of State, although in 1974 its assets were liquidated and the proceeds distributed to shareholders after payment of the corporation's outstanding debts.[1] Defendant Edwin B. Michaels (Mi-

1. Defendant NEPACCO raises the issue of whether NEPACCO as an entity has the capacity to be sued, citing *J.M. Morris Const. Co. v. Mid-West Precote Co.*, 613 S.W.2d 180 (Mo.App.1981) for the proposition that under Missouri law a corporation that has forfeited its charter cannot sue or be sued. Defendant contends that this Court mistakenly applied Delaware law to the issue in this Court's prior order entered September 27, 1982, and that, even if Delaware law should be applied, such law would not support the finding that NEPACCO had the capacity to be sued. A careful review of the statutory and case law, leads this Court to conclude that both arguments are without merit. It is well settled in federal courts that the capacity "to sue or be sued shall be determined by the law under

which it is organized." Fed.R.Civ.P. 17(b). *Moore v. Matthew's Book Co., Inc.*, 597 F.2d 645, 646–647 (8th Cir.1979). The same is true under Missouri common law. *Molasky Enterprises, Inc. v. Carps, Inc.*, 615 S.W.2d 83, 86–87 (Mo. App.1981); and *Pacific Intermountain Express v. Best Truck Lines, Inc.*, 518 S.W.2d 469, 472 (Mo. App.1974). As noted above, NEPACCO was originally incorporated in 1966 under the laws of Delaware and forfeited that charter on August 22, 1976, but failed to file a certificate of voluntary dissolution with the Delaware Secretary of State. 8 Del.Code §§ 103, 275. The law of Delaware controls on the issue of NEPACCO's capacity to sue or be sued; therefore, there is no conflict with V.A.M.S. § 351.525. The law of

chaels) formed NEPACCO, held stock in the corporation, and was its president. Defendant John W. Lee (Lee) was the vice-president of NEPACCO and was also a stockholder. Defendant Ronald Mills (Mills) was employed by NEPACCO at the Verona, Missouri plant as shift supervisor. Defendant Syntex Agribusiness, Inc. (Syntex) is a corporation incorporated in the State of Delaware and doing business in the State of Missouri.

### The NEPACCO Manufacturing Process

On June 7, 1967, defendant Michaels applied for a patent on a method for manufacturing hexachlorophene. On February 6, 1968, defendants Michaels and Lee applied for a patent on a method for purifying 2,4,5-trichlorophenol (TCP) and hexachlorophene. On or about November 18, 1969, NEPACCO entered into an agreement with Hoffman-Taff, Inc., whereby NEPACCO leased portions of the premises at an existing manufacturing facility located near Verona, Missouri, and purchased manufacturing equipment used by Hoffman-Taff and located therein for the purpose of manufacturing hexachlorophene. Hoffman-Taff had manufactured the compound known as agent orange prior to their closure and subsequent sell-out to Syntex. NEPACCO manufactured hexachlorophene at the Verona facility from April 1970 to January 1972. Michaels was present at the Verona facility on a permanent basis during the first year of operation and construction (1970) and during that time had overall responsibility for company operations with the upper level employees reporting to him. By early 1971, Michaels had moved back to the state of Connecticut leaving the direct management responsibility for the NEPACCO plant operation and for quality control with Lee.

The process by which NEPACCO manufactured hexachlorophene involves two steps: first, the production of 2,4,5-trichlo-rophenol (TCP) and second, the production of the finished product, hexachlorophene. The first step in the production of hexachlorophene involved a reaction to form a crude intermediate TCP. This reaction involved a distillation process resulting in refined TCP as the distillate. 2,3,7,8-tetra-chlorodibenzo-p-dioxin (dioxin or TCDD), among other chemicals, was formed as a by-product in the TCP process. The residue or waste that resulted from the TCP distillation is called still bottoms, described as a "dark oily sludge." The highest concentrations of dioxin are found in the still bottoms. Still bottoms were removed from the process every 3rd or 4th batch and transferred to a 7,500 gallon holding tank that was located on the west side of the plant. The holding tank was periodically emptied by waste haulers, who carried the still bottom residue away in tank trucks.

The second step of the production process involved the reaction of the refined TCP with sulfuric acid to form hexachlorophene as a precipitate. Toluene and water were then added to this crude extraction. Decolorizing and filtering clays were added to extract the undesirable shades of color and other impurities, one of which was dioxin. The finished product was hexachlorophene that resembled "white flour." Waste streams from the second step included: waste solvents; recrop liquor remaining after the hexachlorophene had been precipitated; clay filter cake and waste water from both steps of the process as well as from general maintenance and cleaning.

Dioxin may have been found in each waste stream. TCP, TCB and Toluene may have been found in the waste solvents, contaminated waste water and clay filter cake. Hexachlorophene may have been found in the recrop liquor and clay filter cake. Depending upon the efficiency of the production system, the refined TCP

---

Delaware is succinctly stated in *Ross. v. Venezuelan-American,* 230 F.Supp. 701 (D.Del.1964), adopting the rationale of *Wax v. Riverview Cemetary Co.,* 41 Del. 424, 24 A.2d 431 (1942), holding that a corporation with a forfeited charter is not completely dead for all purposes, but merely in "a state of coma," during which it is still subject to suit, even if the suit is brought more than three years after the charter forfeiture. 8 Del.Code § 312(b).

may have contained dioxin that was passed on into the hexachlorophene process. Accordingly, the more efficient a system, the less dioxin contained in the refined TCP, if any. If the refined TCP did contain dioxin, then the dioxin would have been found in the following materials, listed in high to low concentration priority: clay filter cake, finished hexachlorophene and waste water. The industry standard in 1971 for levels of dioxin in refined TCP was one part per million (ppm). The process and equipment used by NEPACCO in 1971 met industry standards and it was conceivable that if the NEPACCO process was continuously efficient the level of dioxin found in the refined TCP would have been below 1 ppm.

Michaels and Lee knew that the NEPACCO manufacturing process produced by-products that contained toxic substances, including dioxin, that could be harmful to human health. Apparently, Michaels and Lee had meetings with the NEPACCO employees to inform them of the possible dangerous toxic substances and procedures to avoid and remedy exposure to these substances.

Unfortunately, the NEPACCO process was not without mishap. On one occasion the 7,500 gallon waste storage tank was filled to capacity and the overflow (still bottoms) was put in four (4) bung type 55-gallon drums that were sealed and marked with orange or red paint. Bill Ray (plant manager) testified that once the storage tank was emptied by the tank truck haulers, the still bottoms contained in the four bung-type barrels were pumped back into the 7,500 gallon storage tank. On two or three occasions the lines to the 7,500 storage tank became blocked necessitating a clean-out operation. On occasion, during these clean-out operations, a small portion of the line spilled onto the floor of the plant and the employees performing the operation. Ray recited one such incident in which he was sprayed with a fine mist by approximately one and a half to two gallons of the substance. Ray immediately showered and took other precautionary steps. The residue and waste from these clean-up operations were placed in trash cans and subsequently taken to the sanitary land fill. Ray testified that he has suffered no ill effects from this incident.

In March of 1971 there was a fire at the NEPACCO plant that resulted in the destruction of at least two batches of reactants in the hexachlorophene production phase of the process. Due to extensive damage, the plant was closed down for several weeks in order to clean up the residue, waste and damaged equipment created by the fire. Some of the substances contained in the production lines were saved and reused. During the summer of 1971, Lee and Ray initiated a major plant cleanup. The waste and residue from the major cleanup were stored in the waste storage area northwest of the plant building. This storage area also contained refuse and wastes that had accumulated since the opening of the plant.

NEPACCO used black drums with lids fastened by metal rings for disposal of waste. According to the testimony, Hoffman-Taff had used green and white drums to hold wastes and several of these green and white drums remained on the plant property after Hoffman-Taff ceased operations. Defendant Lee testified that he originally noticed some of these green and white drums stored on the eastern side of the plant building, but by mid-1971, these drums had been moved to the northwest storage area.

*Disposal of Hazardous Waste at NEPACCO*

Initially, the still bottom residues from the NEPACCO process were carried away in transport tanker trucks by Rollins-Purle to their disposal plant in Louisiana. Later, due to cost considerations, NEPACCO changed from Rollins-Purle to Independent Petrochemical Corporation (IPC). Michaels was present during negotiations with IPC over the contract to haul still bottom residues from the NEPACCO plant and warned the IPC representatives that the still bottoms were toxic and had to be handled and disposed of with care.

In or about July of 1971, defendant Mills approached Ray concerning the disposal of the 55-gallon drums located in the storage area northwest of the plant. Mills was not in the business of waste disposal prior to this date. Ray discussed the proposal with Lee. Lee defined the desirable disposal site characteristics, which included soil with a flint or clay consistency. There was credible evidence that Lee knew and approved of the proposed use of Mill's services and the disposal site. Ray personally went to the disposal site prior to the actual delivery and reported to Lee on his observations. Mills had previously contacted James Denney (Denney) and arranged to dispose of the drums on his farm. The Denney farm site is located approximately seven miles south of Verona, Missouri.

In mid-July 1971, defendant Mills and Gerald Lechner (Lechner), an assistant hired by Mills, loaded approximately eighty-five 55-gallon drums containing wastes, located at the northwest storage site. Defendant Mills and Lechner took the drums to the Denney farm and deposited them in a large trench approximately six to eight feet deep, ten feet wide and fifty feet long. Mills hired Leon Vaughn (Vaughn) to excavate and close the trench. Within two days, six loads were taken to the Denney farm site, whereupon, the trench was closed by Vaughn. No other materials were placed in the Denney farm trench other than those transported by Mills and Lechner from the Verona NEPACCO plant. Mills received $150.00 from NEPACCO for each load that was taken to the Denney farm site and Denney received $25.00 from Mills for each load.

Mills and Lechner testified concerning the description of the drums hauled and their contents. According to Mills, most of the drums were a black metal type with lids. Mills did not recall whether there were any bung type drums hauled. Mills further testified that some of the barrels contained a brown liquid substance and some contained a white substance. Mills was certain that some of the barrels contained Toluene. Lechner gave a more detailed description of the barrels and their

contents. According to Lechner, some of the drums were a bung type top and others had the open lid type top. Although most of the drums were black, some were rust colored. The drums were in a deteriorated condition. While Lechner was loading the barrels, he managed to step through the lid of one barrel causing some of the "dark sludge", presumably still bottoms, contained in the drum to get on his pants leg and boot. Lechner did not notice any immediate results but later noted that the substance "ate up" his pants leg and boot. Lechner testified that he has suffered no physical injuries from the mishap.

Neither Mills nor Lechner could remember whether they hauled any drums other than those colored black. James Denney testified that when the trench was opened in 1980 by the EPA he observed some green drums being taken from the trench. Denney further testified that within a short period of time after the trench had been covered, a strong odor emitted from the trench. This strong odor continued for several months, maybe years, but had ceased by 1979.

*Governmental Response*

In October of 1979 the Environmental Protection Agency (EPA) received an anonymous tip indicating that waste materials from the NEPACCO plant had been disposed at the Denney farm. Under the supervision of Daniel Harris (Harris), an EPA environmental engineer and field investigator, the EPA commenced an investigation. The EPA confirmed through state records that the NEPACCO operation did generate hazardous waste. In October of 1979, EPA representatives met with Denney, who confirmed that drums of wastes from the NEPACCO plant had been buried in a trench at the Denney farm and identified the location of the trench. EPA representatives contacted Dr. J. Hadley Williams (Williams), a geologist with the Missouri Department of Natural Resources, for the purpose of determining if the Denney farm was suitable for the disposal of hazardous wastes. Dr. Williams indicated it was not,

due to the nature of the region's subsurface composition and ground water conditions. EPA representatives interviewed approximately 25 other persons in October of 1979 in order to gain some familiarity with the NEPACCO operation, its wastes, and its waste disposal practices.

Between January and April of 1980, the EPA, along with comments from state and federal officials, drafted a plan for an on-site investigation at the Denney farm site. Prior to conducting on-site sampling tests, certain preliminary steps were completed, which included clearing the disposal site and an access road and constructing a security fence around the site.

In April of 1980, the EPA commenced the on-site investigation which consisted of different teams of individuals collecting soil samples from boreholes at different distances around the perimeter of the site, removing a portion of the soil covering the trench, exposing 13 drums, sampling eight of them, and sampling the soil in and near the trench. Samples were also taken of nearby well water. The drums exposed and those finally removed were in a deteriorated condition, exhibiting extreme rust and decomposition.

A composite sample from the buried drums, collected during the April 1980 investigation, was analyzed by Brehem Laboratories at Wright State University and found to contain a dioxin concentration as high as 319 parts per million (ppm). Dr. Michael L. Taylor, associate director of the laboratory, testified that he immediately telephoned the Region 7 office of the EPA when he learned of the alarming high concentration of dioxin found in the composite sample. Other samples from the buried drums and soil samples collected during the April 1980 investigation were analyzed by the EPA and found to contain TCP and Toluene in concentrations as high as 63 ppm and 40 ppm, respectively. Dr. Robert D. Kloepfer (Kloepfer), an analytical chemist and Chief of the Organic Analysis Section for Region 7, EPA, noted seven samples with concentrations above 1.0 ppm, specifically those concentrations were reported as follows: drum sample 1—6.6 ppm, drum sample 3—1.1 ppm, sample No.'s ANO216 —1.1 ppm, ANO217—2.1 ppm, ANO237— 6.3 ppm, ANO241—5.6 ppm and ANO271— 3.9 ppm. The standard variation (degree of accuracy) for these tests is 25%, higher or lower. The EPA's principal concern at this time was the presence of dioxin.

After confirming that dioxin was present in the trench and consulting with Dr. Williams, the EPA in June or July of 1980 installed a temporary cap over the trench to prevent entry of surface waters into the trench and thereby minimize release of materials from the trench into the environment. EPA representatives continued to conduct surface and well water samplings to monitor the site in order to detect any escape of the materials from the trench.

Ecology and Environment, Inc. (Ecology and Environment), under contract with the EPA, prepared an engineering feasibility study to serve as the plan for further response actions at the Denney farm site. James Buchanon, regional project manager for Ecology and Environment, testified that Ecology and Environment was assigned three principal tasks: conduct a feasibility study, provide expert technical advice at the site and monitor the site. As part of these tasks, additional on-site testing was completed to better define the extent of the release and the size of the disposal trench. The final report and suggestions for remedial action were issued in September, 1980. The final report and suggestions issued by Ecology and Environment were made under the hypothesis that the Denney farm trench contained 26.4 lbs. of dioxin, the maximum risk potential for this site.

In July and August of 1980, EPA representatives negotiated with Syntex concerning the initial cleanup process and responsibilities. On September 3, 1980, a consent decree was entered into by the EPA and Syntex.[2] In November of 1980,

---

2. Defendants contend that since the EPA and

Syntex have entered into a consent decree con-

defendant Syntex proposed a plan for a permanent solution involving the removal, storage and ultimate disposal of the wastes discovered at the Denney farm site. Once the Syntex plan was approved by the EPA, Syntex began excavation of the contents of the disposal trench in June of 1981. The excavation process took approximately six weeks, due mainly to the safety precautions taken against dioxin contamination of the workers.

During the Syntex excavation, numerous drum and soil samples were collected by the EPA and Syntex. The Syntex analysis indicated migration of the dioxin into the subsurface strata of the trench at least as far as 30 inches, in concentrations ranging from 8.2 parts per billion (ppb) to 532 ppb. While Syntex is in the process of implementing a permanent solution, the EPA continues to monitor its implementation of the Syntex plan and otherwise to monitor the site and the surrounding area to detect any past or present movement of hazardous waste from the site or any significant change in the conditions.

The site was closed in November of 1981 and the drums are stored in a concrete bunker on the site. According to Harris the stored hazardous waste no longer presents an imminent and substantial endangerment to health or the environment, but necessitates future monitoring and further response costs.

*Endangerment to Health and the Environment*

To date, dioxin has produced teratogenic, mutagenic, fetotoxic and carcinogenic results in low dose levels in various laboratory animals. Dr. D. Diane Courtney, a pharmacologist with the EPA, testified that dioxin is particularly devastating to specific organs of laboratory animals and human beings; e.g., liver, kidneys, intestines, nervous system, reproductive, and skin. Dioxin is persistent in the environment and is bioaccumulative in the tissues of plants and animals. According to Dr. Courtney, there is presently no known safe level of dioxin in the environment. Toluene has been shown to cause damage to the liver and kidneys. Hexachlorophene has known toxicological properties and has caused pathological damage, specifically brain deterioration in newborn animals, as well as kidney and liver damage. Dioxin, hexachlorophene and Toluene have high levels of toxicity at low-dose levels.

There was a substantial likelihood that the environment and human beings would be exposed to the toxic wastes dumped in the Denney farm trench. Dr. Williams testified that the Denney farm is located in an area of karst terrain underlain by limestone bedrock with sinks, underground streams and caverns. The geohydrology at the Denney farm is such that particles, water and leachate may move rapidly down through the soil to the water table below. This rapid movement occurs through randomly occurring discrete openings in the soil and rock. The ground water beneath the Denney farm was estimated by Dr. Williams to be the source of water for a number of nearby residential and agricultural wells. While the ground water beneath the site is believed to form a water table that may flow towards Calton Creek, approximately one-third mile from the Denney farm site, actual rates and directions of ground water movement in the Denney farm area are impossible to predict. Unfortunately, it is impossible to predict whether high levels of toxic dioxin or other hazardous contaminants remain in the karst soil beneath the Denney farm, presenting future possibilities of exposure, if the permeability of the soil and bedrock allow the substances to flow toward the Calton Creek. Though not conclusive of the ground water movement beneath the Denney farm site, Dr. Williams did conduct dye tests in the region. Dr. Williams placed a dye in certain boreholes upstream on the Calton Creek in the Denney farm

---

cerning the cleanup of the Denney farm site, this action should be dismissed as moot. The Court finds this argument without merit. This is an action for the recovery of costs incurred by the plaintiff, not Syntex. The relief granted in the consent decree does not concern the costs sought in this action.

region in April of 1980. One month later, May of 1980, Dr. Williams found traces of this dye in area springs and wells and collecting in charcoal packets placed downstream on the Calton Creek. Because of the region's soil conditions, there was a substantial likelihood of the hazardous wastes in the trench at the Denney farm site entering the environment and going into the ground water system; whereupon, the contaminants may have come into contact with members of the public who may have been adversely affected by their exposure to these wastes.

Pursuant to the consent decree, entered September 3, 1980, Syntex removed the deteriorated drums and other contaminated materials from the trench and placed them in temporary storage, a concrete bunker, on the Denney farm site. As of yet, Syntex has not successfully developed a feasible method of permanent disposal. The wastes no longer present an imminent and substantial endangerment.

## DISCUSSION

*I. Section 7003 of the Resource Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C. § 6973 (1980)*

▮ Count I of plaintiff's amended complaint is based on section 7003 of RCRA, which states, in pertinent part:

§ 6973. Imminent hazard

(a) Authority of Administrator

Notwithstanding any other provision of this chapter, upon receipt of evidence that the handling, storage, treatment, transportation or disposal of any solid waste or hazardous waste may present an imminent and substantial endangerment to health or the environment, the Administrator may bring suit on behalf of the United States in the appropriate district court to immediately restrain any person contributing to such handling, storage, treatment, transportation or disposal to stop such handling, storage, treatment, transportation or disposal or to take such other action as may be necessary. The Administrator shall provide notice to the affected state of any such suit. The Administrator may also, after notice to the affected state, take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and the environment.

In order to recover the costs expended by the government under section 7003, the plaintiff must show that the defendants are such persons contributing to the handling, storage, treatment, transportation or disposal of a hazardous waste which may present an imminent and substantial endangerment to health or the environment.

The Court finds that the defendants are not liable under section 7003 for the response costs incurred prior to December 11, 1980. The pivotal issue relative to the application of section 7003 to the named defendants is whether the defendants were "contributing to such handling, storage, treatment, transportation or disposal" within the intended scope of section 7003. It must first be observed that the plaintiff does not allege negligence on the part of the defendants. The Court has reviewed the initial complaint, the amended complaint, the standard pretrial order No. 2, and trial notes and has found no allegation of negligence by the defendants. The issue is therefore more properly narrowed to state, whether a past non-negligent off-site generator and transporter can be held liable under section 7003 for response costs. Plaintiff contends that the defendants are "contributing to" the present "disposal" of the hazardous waste insofar as the hazardous wastes are presently "leaking" from the Denney farm site into the environment. In support of this proposition, plaintiff further contends that section 7003 does not require present active human involvement but merely a present imminent and substantial endangerment for which the defendant is strictly liable, regardless of the time at which the active human involvement ceased.[3] Defendants in opposition

3. Plaintiff cites in support of this argument: *United States v. Price,* 688 F.2d 204 (3d Cir.

contend that section 7003 does not apply to inactive or abandoned sites such as the Denney farm site, *United States v. Waste Industries*, 556 F.Supp. 1301, 1303–14 (E.D.N.C.1982), and even if section 7003 does apply to inactive sites, section 7003 does not make past non-negligent off-site generators or transporters liable. *United States v. Wade*, 546 F.Supp. 785 (E.D.Pa. 1982). After a thorough review and analysis of the statutory language, case law and legislative history, the Court finds that section 7003 does not apply to past non-negligent off-site generators or transporters. Because the Court makes this narrow finding, it will not be necessary to address the issue of whether section 7003 applies to inactive or abandoned sites under different factual circumstances.

▮ If the statutory language is clear and unambiguous, then the language is controlling. *Touche Ross v. Redington*, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979) and *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976). If the defendants are to be held liable under section 7003 then they must be classified as part of the class of persons "contributing to such handling, storage, treatment, transportation or disposal" resulting in the imminent and substantial endangerment. 42 U.S.C. § 6973. Initially, the Court notes that the phrase "contributing to" is not defined in the statutory framework of RCRA, specifically 42 U.S.C. § 9603, nor does the statutory framework of RCRA lend substantial support to the inclusion of past non-negligent off-site generators or transporters.

Not having found the statutory framework of RCRA particularly illuminating on the phrase "contributing to," this Court concurs in the language found in *City of Philadelphia v. Stepan Chemical Co.*, 544 F.Supp. 1135 (E.D.Pa.1982), quoting: "Chief Justice Marshall's timeless observation that '[w]here the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived. . . .' *United States v. Fisher*, 6 U.S. (2 Cranch) 358, 386 [2 L.Ed. 304] (1805)." *Id.* at 1142. As numerous courts have noted, the legislative history of RCRA and specifically 7003 is "quite sketchy," *United States v. Midwest Solvent Recovery, Inc.*, 484 F.Supp. 138, 143 (N.D.Ind.1980), confusing and in some instances seemingly contradicting. *Waste Industries*, 556 F.Supp. at 1311; and *Wade*, 546 F.Supp. at 791. Apparently, Congress' major purpose in passing RCRA was to control the manner of disposing of hazardous wastes as opposed to cleaning up the results of past disposal. RCRA has been amply termed "cradle-to-grave" regulatory legislation, designed to trace the life cycle of hazardous waste.[4] Congress specifically stated the goal of RCRA as follows:

> The Committee believes that the approach taken by this legislation eliminates the last remaining loophole in environmental law, that of unregulated land disposal of discarded materials and hazardous wastes. . . . This legislation is necessary if other environmental laws are to be both cost and environmentally effective.

H.R.Rep. No. 1491, 94th Cong., 2d Sess. 4, *reprinted in* [1976] U.S. Code Cong. & Ad.News 6238, 6241–42. The Committee Report continues to explain how the government has spent substantial amounts of money on air and water pollution control

1982); *United States v. Reilly Tar & Chemical Corp.*, 546 F.Supp. 1100 (D.Minn.1982); *United States v. Price*, 523 F.Supp. 1055 (D.N.J.1981); *United States v. Price*, 577 F.Supp. 1103 (D.N.J. 1983); and *United States v. Diamond Shamrock Corp.*, No. C80–1857 (N.D.Ohio May 29, 1981).

4. H.R.Rep. No. 1016, 96th Cong., 2d Sess. 17, *reprinted in* [1980] U.S.Code Cong. & Ad.News 6119, 6120. *See generally* Note, *The Comprehensive Environmental Response, Compensation*

*and Liability Act of 1980: Is Joint and Several Liability the Answer to Superfund?*, 18 New England L.Rev. 109, 112 (1982); Costle & Beck, *Attack on Hazardous Waste: Turning Back the Toxic Tide*, 9 Cap.U.L.Rev. 425, 432 (1980); and Goldfarb, *The Hazardous Waste Policy*, 19 Nat. Resources J. 249, 253 (1979). *See also* A. Sutherland, 2A *Statutes and Statutory Construction*, § 4605, 56 (4th ed., Sands Ed.1973) (Statutes should be construed as a whole, not in part).

merely to have the waste dumped into or on the ground. *Id.*

Although it could be argued that Congress was unaware of the problems arising from inactive or abandoned sites, Congress expressly recited such instances of the damage caused by hazardous waste disposal practices in the legislative history. H.R. Rep. No. 1491, *supra*, at 17–24, *reprinted in* [1976] U.S. Code Cong. & Ad.News at 6254–6261. It would be more properly stated that Congress was unaware of the magnitude and expense of inactive or abandoned sites, as well as the lack of current means or financially responsible parties to clean up those sites.[5] This Court concludes that Congress, knowledgeable of the existence of hazardous waste problems, chose to principally direct RCRA's provisions toward the regulation of the source and not the results of hazardous waste disposal.[6]

In reviewing the subsequent legislative history of RCRA and CERCLA, it appears that Congress and the American public became more aware of the magnitude and expense of the problems associated with inactive sites as the Love Canal and similar sites came to the forefront.[7] Congress appeared more enlightened of the massive problems arising from inactive sites when discussing the need for further legislation, "Since enactment of [RCRA], a major new source of environmental concern has surfaced: the tragic consequences of improperly, negligently, and recklessly hazardous waste disposal practices known as the 'inactive hazardous waste site problem.' ... Existing law is clearly inadequate to deal with this massive problem." H.R.Rep. No. 1016, 96th Cong., 2d Sess. 17–18, *reprinted in* [1980] U.S.Code Cong. & Ad. News 6119, 6120.[8]

The only reference in the legislative history that would lend support to the position that section 7003 applies to past non-negligent off-site generators or transporters states, "a company that generates hazardous waste would be someone 'contributing to' an endangerment under § 7003, even where someone else deposited the waste in an improper disposal site similar to strict

---

5. In fact, some consideration was given by Congress to remedying the harms of past disposal practices as set forth in the "Inflationary Impact Statement" accompanying RCRA:

 The Committee also considered the potential costs incurred with the cleanup of underground aquifers, which are the source of drinking water for approximately 50 percent of our population, and the cost of providing new alternate water supplies. The Committee found that eliminating the source of underground water pollution appeared to be much more cost effective and less inflationary in the long term than other available alternatives. H.R.Rep. No. 1491, 94th Cong., 2d Sess. 73, *reprinted in* [1976] U.S.Code Cong. & Ad.News at 6312.

6. The only reference to section 7003, contemporaneous with its passage, in the legislative history is found at H.R.Rep. No. 1491, *supra*, at 69, *reprinted in* [1976] U.S.Code Cong. & Ad.News at 6308, and merely reiterates that the EPA "may bring suit in the United States District Court, for appropriate relief." No mention of section 7003 or the parties liable thereto appears in the enforcement sections of RCRA. 42 U.S.C. § 6928. This may be explained by the fact that all prior major environmental legislation: Section 1431 of the Safe Drinking Water Act, 42 U.S.C. § 300i(a) (1976); Section 504(a) of the Clean Water Act, 33 U.S.C. § 1364(a) (Supp. IV

1980); Section 303 of the Clean Air Act, 42 U.S.C. § 7603 (Supp. IV 1980); and Section 106(a) of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9606(a) (Supp. IV 1980), have included emergency provisions such as section 7003 and to do so in RCRA was merely done as a matter of course. *See Waste Industries,* 556 F.Supp. at 1311. Congress did not give considerable thought to the scope of liability under section 7003 at the time of RCRA's passage.

7. *See The Preemptive Scope of the Comprehensive Environmental Response, Compensation and Liability Act of 1980: Necessity for an Active State Role,* 34 U.Fla.L.Rev. 635, 639 (1982); and *Using RCRA's Imminent Hazard Provision in Hazardous Waste Emergencies,* 9 Ecology L.Q. 599, 599 n. 2 (1981).

8. The discussions surrounding the enactment of CERCLA and the amendments to RCRA appear to be much more illustrative of the scope of liability under section 7003. Subsequent legislative history concerning prior legislation is due considerable weight in determining legislative intent. *United States v. Solvents Recovery Service of New England,* 496 F.Supp. 1127, 1140 n. 18 (D.Conn.1980); and *Waste Industries,* 556 F.Supp. at 1311 n. 21 and 1312 (acknowledges weight to be given subsequent legislative history, but adds a caveat).

liability under common law." *Report on Hazardous Waste Disposal by the Subcommittee on Oversight and Investigations of the House Committee on Interstate and Foreign Commerce*, 96th Cong., 1st Sess. 31 (Comm. Print 1979) [hereinafter cited as Eckhardt Report]. This subcommittee report is subject to numerous objections.[9] Most importantly, the broad language of the Eckhardt Report was not adopted in the full Senate report which reinstated a standard of negligence under section 7003, in stating:

> [S]ection 7003 should not be construed solely with respect to the common law. Some terms and concepts, such as person "contributing to" disposal resulting in a substantial endangerment, are meant to be more liberal than their common law counterparts. For example, a company that generated hazardous waste might be someone "contributing to" air endangerment under section 7003 even where someone else deposited the waste in an improper disposal site (similar to strict liability under common law), *where the generator had knowledge of the illicit*

*disposal or failed to exercise due care in selecting or instructing the entity actually conducting the disposal.*

S.Rep. No. 172, 96th Cong., 2d Sess. 5, *reprinted in* [1980] U.S. Code Cong. & Ad.News 5019, 5023 (emphasis added). At best, this language would suggest strict liability of present responsible landowners, but the qualifying phrase "illicit disposal or failed to exercise due care" requires a finding of negligence prior to holding past off-site generators or transporters liable. Although this Court is in agreement that the phrase "contributing to" is to be given a broad interpretation, *United States v. Price*, 523 F.Supp. 1055, 1073 (D.N.J.1981), the Court believes the language found in *Midwest Solvent Recovery, Inc.*, 484 F.Supp. at 144, to be a more prudent conclusion, "Any provision that could logically be read so to expand the set of persons liable under the federal solid and hazardous waste regulatory scheme would surely be identified as such in the legislative history." *Id. Accord Waste Industries*, 556 F.Supp. at 1308; and *Wade*, 546 F.Supp. at 790.[10]

**9.** As noted by the court in *Waste Industries*, 556 F.Supp. at 1312, the Eckhardt Report is also subject to numerous internal inconsistencies and interpretations that were found not to be consistent with imposing strict liability on past off-site generators and transporters. *Id.*

**10.** The legislative history surrounding the passage of CERCLA supports this Court's conclusion. The House Report accompanying the passage of CERCLA states:

> (c) Deficiencies in RCRA have left important regulatory gaps.
>
> (1) [RCRA] is prospective and applies to past sites only to the extent that they are posing an imminent hazard. Even there, the Act is no help if a *financially responsible owner* of the site cannot be located.
>
> \* \* \* \* \* \*
>
> It is the intent of the Committee in [CERCLA] to initiate and establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites.

H.R.Rep. No. 1016, Part I, 96th Cong., 2d Sess. 22, *reprinted in* [1980] U.S.Code Cong. & Ad. News 6119, 6125 (emphasis added). The Committee reiterated the inadequacies of RCRA in dealing with inactive sites, in stating, "The [EPA] may sue to require cleanup of an inactive

disposal site if the site is posing an imminent and substantial hazard to public health. However, this provision does not provide funds for cleanup of inactive sites when the owner is unknown, is not responsible, or is financially unable to pay for these costs." H.R.Rep. No. 1016, Part II, 96th Cong., 2d Sess. 4, *reprinted in* [1980] U.S.Code Cong. & Ad.News 6151, 6153. *See Waste Industries*, 556 F.Supp. at 1318 and secondary authorities cited therein; and *United States v. Price*, 577 F.Supp. 1103 at 1110 (D.N.J. 1983). For a similar analysis of the deficiencies in RCRA, *see Hazardous Waste Disposal: Hearings Before the Subcomm. on Oversight and Investigations of the House Comm. on Interstate and Foreign Commerce*, 96th Cong., 1st Sess. pt. 1–4 (1979); Subcomm. on Oversight and Investigations of the House Comm. on Interstate and Foreign Commerce, 96th Cong., 1st Sess., *Report on Hazardous Waste Disposal* 3 (Comm. Print 1979); *Inactive or Abandoned Hazardous Waste Disposal Sites: Coping With a Costly Past*, 53 S.Cal.L.Rev. 1709, 1716 (1980); and Goldfarb, *The Hazards of Our Hazardous Waste Policy*, 19 Nat. Resources J. 249 (1979). Even the EPA apparently concurs in this court's conclusion, "We can only exercise [section 7003] where the [site] owner ... is identifiable and financially and otherwise able to remedy [the damage].... In addition, if the perpetrator is unknown ...

After a careful review of what this Court believes to be all cases relevant to the imposition of liability under section 7003,[11] it has been unable to find any case in which liability has been imposed on past non-negligent off-site generators or transporters. The broadest scope of liability given the phrase "contributing to" was in *United States v. Price*, 523 F.Supp. 1055 (D.N.J. 1981), *aff'd*, 688 F.2d 204 (3rd Cir.1982) (denying petition for preliminary injunction and motion for summary judgment) and *United States v. Price*, 577 F.Supp. 1103 (D.N.J.1983) (denying past off-site generators' motion for summary judgment). In *Price*, 523 F.Supp. at 1069–1074, the Court held that liability under section 7003 could encompass the present owners of the inactive site, the past principal owner/operator and co-owner of the site, as well as, an employee of the past owner/operator. This Court does not deem it necessary to comment at this time upon the rationale of the district court in *Price*, 523 F.Supp. 1055, except to point out that in its subsequent memorandum opinion, *Price*, 577 F.Supp. 1103, the court specifically reserved any decision on the liability of past non-negligent off-site generators under section 7003. *Id.*, slip op. at 26 n. 12 at 837 n. 12.[12]

■ The Court having reviewed the statutory language, the legislative history and the past judicial interpretations of section 7003 concludes that the defendants are not liable under section 7003. This finding is based upon the Court's conclusion that section 7003 does not impose liability upon past non-negligent off-site generators or transporters.[13]

cannot be located, cannot afford cleanup, or declares bankruptcy and walks away from the site ... [section 7003] is not an effective tool." *Hazardous and Toxic Waste Disposal: Joint Hearings on S.1341 and S.1480 Before the Subcomm's on Environmental Pollution and Resource Protection of the Senate Comm. on Environment and Public Works*, (part 4), 96th Cong., 1st Sess., 7, 43 (1979) (statement of Thomas C. Jorling, Assistant Administrator, Water and Waste Management, EPA). *Accord Wade*, 546 F.Supp. at 791. *See Waste Industries*, 556 F.Supp. at 1314 and n. 23 ("agency's view is entitled to substantial deference" (citation omitted)). *See generally* Note, *Liability for Generators of Hazardous Waste: The Failure of Existing Enforcement Mechanisms*, 69 Geo.L.J. 1047, 1053–55 (1981).

11. *See United States v. Price*, 688 F.2d 204 (3d Cir.1982); *United States v. Price*, 577 F.Supp. 1103 (D.N.J.1983); *State ex rel. Brown v. Georgeoff*, 562 F.Supp. 1300 (N.D.Ohio 1983); *United States v. Waste Industries*, 556 F.Supp. 1301 (E.D.N.C.1982); *United States v. Outboard Marine Corp.*, 556 F.Supp. 54 (N.D.Ill.1982); *United States v. Wade*, 546 F.Supp. 785 (E.D.Pa.1982); *United States v. Reilly Tar & Chemical Corp.*, 546 F.Supp. 1100 (D.Minn.1982); *City of Philadelphia v. Stepan Chemical Co.*, 544 F.Supp. 1135 (E.D.Pa.1982); *United States v. Hardage*, No. Civ. 80–1031–W (W.D.Okla. Sept. 29, 1982); *United States v. Price*, 523 F.Supp. 1055 (D.N.J. 1981); *McCastle v. Rollins Environmental Services*, 514 F.Supp. 936 (M.D.La.1981); *United States v. Diamond Shamrock Corp.*, No. C80–1857 (N.D.Ohio May 29, 1981); *United States v. Solvents Recovery Service of New England*, 496 F.Supp. 1127 (D.Conn.1980); *United States v. Vertac Chemical Corp.*, 489 F.Supp. 870 (E.D.

Ark.1980); and *United States v. Midwest Solvent Recovery, Inc.*, 484 F.Supp. 138 (N.D.Ind.1980).

12. Although plaintiff contends that the term "disposal" found in section 7003 should include the "leaking" of contaminants into the environment, the Court finds this argument of little significance in determining the parties' liability under 7003. This would not be the case if the ultimate issue was whether section 7003 applied to inactive disposal sites under all circumstances.

13. Federal common law governing hazardous waste disposal has been preempted by subsequent Congressional legislation, RCRA and CERCLA. The Court is therefore without recourse to federal common law in determining the defendants' liability under section 7003 or CERCLA. *Milwaukee v. Illinois* (Milwaukee II), 451 U.S. 304, 317–32, 101 S.Ct. 1784, 1792–1800, 68 L.Ed.2d 114 (1981); and *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 22, 101 S.Ct. 2615, 2627, 69 L.Ed.2d 435 (1981). *Accord Waste Industries*, 556 F.Supp. at 1314–16; *Outboard Marine Corp.*, 556 F.Supp. at 55–56; *Stepan Chemical Co.*, 544 F.Supp. at 1146–1148; and *Price*, 523 F.Supp. at 1069. *See generally Common Law Nuisance in Hazardous Waste Litigation: Has It Survived Milwaukee II?*, 13 E.L.R. 10043 (1983); and *The Preemptive Scope of the Comprehensive Environmental Response, Compensation and Liability Act of 1980: Necessity For an Active State Role*, 34 U.Fla.L. Rev. 635 (1982). *But see generally Using RCRA's Imminent Hazard Provision in Hazardous Waste Emergencies*, 9 Ecology L.Q. 599, 613–614 (1981) ("federal common law remedies made available" to fill gaps of section 7003. *Id.* at 614).

*II. Sections 104, 106(a) and 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of 1980, 42 U.S.C. §§ 9604, 9606(a) and 9607(a)*

Counts II and III of the amended complaint were brought pursuant to section 106(a) of CERCLA, 42 U.S.C. § 9606(a) and sections 104, 107(a) of CERCLA, 42 U.S.C. §§ 9604 and 9607(a), respectively. Specifically, the prayer for relief includes a request to abate an imminent and substantial endangerment to health and the environment caused by the continuing storage and disposal of hazardous waste at the Denney farm site and for reimbursement of response costs incurred by the plaintiff.

Before dealing with the issues, a brief history and general outline of CERCLA appears advisable for benefit of further discussion. CERCLA was enacted in response to the inadequacies of RCRA and "to the growing problem caused by the large number of uncontrolled 'inactive hazardous waste sites.' In fact, Congress, describing the background and necessity for CERCLA, specifically noted that 'existing law is clearly inadequate to deal with this massive problem ... [and therefore] the need for a strong legislative response is evident.' [citation omitted]." *Price,* 577 F.Supp. 1103 at 1109. *See also Wade,* 546 F.Supp. at 792–93. Most importantly, CERCLA establishes two funding mecha-

nisms for the cleanup and monitoring of hazardous waste sites: the Hazardous Substance Response Trust Fund, sections 211, 221, 26 U.S.C. § 4611 et seq. and 42 U.S.C. § 9631; and the Post-Closure Liability Fund, sections 107(k), 111(j) and 232, 42 U.S.C. §§ 9607(k), 9611(j) and 9641. After noting the specific inadequacies of RCRA, Congress stated, "It is the intent of the Committee in [CERCLA] ... to initiate and establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites." H.R.Rep. No. 1016, *supra,* at 22, *reprinted in* [1980] U.S.Code Cong. & Ad. News at 6125. *See Price,* 577 F.Supp. 1103 at 1109. Suffice it to say in summary, section 102 [42 U.S.C. § 9602] requires the government to promulgate a list of hazardous substances, section 103 [42 U.S.C. § 9603] requires that the release from vessels and facilities of wastes be reported to the EPA, section 104 [42 U.S.C. § 9604] grants the federal authorities [14] broad authority to respond to hazardous waste pollution by cleaning up the source and mitigating its effects, section 106 [42 U.S.C. § 9606] is an imminent hazard provision similar to RCRA's section 7003 [42 U.S.C. § 6973], and section 107 [42 U.S.C. § 9607] lists those responsible for the hazardous waste releases as well as what they are responsible for.[15]

Neither RCRA, nor CERCLA, require the plaintiff to allege or show interstate effects in order for this Court to have subject matter jurisdiction. *See United States v. Reilly Tar & Chemical Corp.,* 546 F.Supp. 1100, 1107 and 1113 (D.Minn.1982); *United States v. Price,* 523 F.Supp. 1055, 1070 n. 3 (D.N.J.1981), *aff'd,* 688 F.2d 204 (3rd Cir.1982); and *United States v. Solvents Recovery Service of New England,* 496 F.Supp. 1127, 1138–39 (D.Conn.1980).

**14.** Although the Act grants most of the substantive authority to the President, he has delegated these and other superfund implementation authority to the EPA, the Coast Guard, and various other agencies. Exec. Order No. 12316, 46 Fed. Reg. 42,237 (1981).

**15.** For a more thorough discussion of the general outline and financing mechanisms of CERCLA, *see Wade,* 546 F.Supp. at 792–93; *Reilly Tar*

*& Chemical Corp.,* 546 F.Supp. at 1111–12; and *Stepan Chemical Co.,* 544 F.Supp. at 1142–43. *See generally* R.M. Hall, Jr., *The Problem of Unending Liability for Hazardous Waste Management,* 38 Bus.Law. 593, 600–01 (1983); J. Sachs, *Environmental Law & Practice,* Practising Law Inst. (1982); *The Preemptive Scope of the Comprehensive Environmental Response, Compensation and Liability Act of 1980: Necessity for an Active, State Role,* 34 U.Fla.L.Rev. 635, 653 (1982); and Ekhardt, *The Unfinished Business of Hazardous Waste Control,* 33 Baylor L.Rev. 253 (1981). CERCLA, although nicknamed "the Superfund," is not the ultimate tool in dealing with the problems associated with inactive or abandoned hazardous waste sites as initially intended by its sponsors. CERCLA is in fact a hastily drawn piece of compromise legislation, marred by vague terminology and deleted provisions. As will be noted below, numerous important features were deleted during the closing

*A. Retroactive Application of CERCLA to Non-negligent Past Off-Site Generators and Transporters*

Defendants contend that sections 104, 106(a) and 107(a), 42 U.S.C. §§ 9604, 9606(a) and 9607(a), are not to be given retroactive application, and if applied retroactively, the statutes are in violation of constitutional due process. The Court finds the defendants' arguments without merit.

■ It is a well settled rule of law that legislation is presumed to apply prospectively and that it is the plaintiff's burden of proof to show that the statute is to be given retroactive effect. *Greene v. United States*, 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964) ("unequivocal and inflexible import of the terms, and the manifest intention of the legislature." *Id.*); and *Alyeska Pipeline Service Co. v. United States*, 624 F.2d 1005, 1013, 224 Ct.Cl. 240 (1980). The Court agrees that the appropriate definition of retroactive application is, "one which '... creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past....'" *State ex rel. Brown v. Georgeoff*, 562 F.Supp. 1300, 1303 (N.D.Ohio 1983), quoting Justice Story in *Society for Propagating the Gospel v. Wheeler*, 22 F.Cas. 756, 767 (C.C.D. N.H.1814) (No. 13,156).

■ There can be little doubt that sections 104 and 107(a) were intended to apply retroactively. A brief review of the case law and legislative history clearly supports this proposition. It was the precise inadequacies resulting from RCRA's lack of applicability to inactive and abandoned hazardous waste disposal sites that prompted the passage of CERCLA. This Court concludes that sections 104 and 107(a) of CERCLA were intended to apply retroactively. *Georgeoff*, 562 F.Supp. at 1302–12; *Waste Industries*, 556 F.Supp. at 1316–17; *Wade*, 546 F.Supp. at 792–93; and *Stepan Chemical Co.*, 544 F.Supp. at 1140–41.

A more perplexing issue is the application of section 106(a) to inactive or abandoned hazardous waste disposal sites. Section 106(a) is similar to section 7003 of RCRA in that they are both emergency provisions, but this Court notes several critical differences. Section 106(a) authorizes judicial action when an imminent and substantial endangerment to the public health, welfare or the environment *is caused by an actual or threatened release of hazardous waste.* Although the statutory language does not explicitly refer to inactive sites, Congress made this explicitly clear.[16] The Court finds that section 106(a) applies to inactive sites and that the same persons listed as liable under section 107(a) are liable under section 106(a). *United States v. Reilly Tar & Chemical Corp.*, 546 F.Supp. 1100, 1112–13 (D.Minn.1982); and *United States v. Outboard Marine Corp.*, 556 F.Supp. 54, 56 (N.D.Ill.1982). To read sections 104, 106(a) and 107(a) otherwise would be to emasculate the purpose of CERCLA and the intent of Congress. H.R.Rep. No. 1016, *supra*, at 17, *reprinted in* [1980] U.S.Code Cong. & Ad.News 6119.[17]

hours of the Congressional session. *Price*, 577 F.Supp. 1103 at 1109; *State ex rel. Brown v. Georgeoff*, 562 F.Supp. 1300, 1311 n. 12 (N.D.Ohio 1983); *Reilly Tar & Chemical Corp.*, 546 F.Supp. at 1111–12; and *Stepan Chemical Co.*, 544 F.Supp. at 1142 and n. 9. *See generally* Ekhardt, *The Unfinished Business of Hazardous Waste Control*, 33 Baylor L.Rev. 253 (1981). The courts are once again placed in the undesirable and onerous position of construing inadequately drawn legislation.

16. [Section 106] authorizes the Administrator to take emergency actions to protect public health or the environment whenever he receives evidence that the release of hazardous waste from an inactive site presents or may present an imminent and substantial danger to public health or the environment, or that there is a substantial threat of such a release.... The Committee intends this standard to be a flexible one....
H.R.Rep. No. 1016, 96th Cong., 2d Sess. 27–28, *reprinted in* [1980] U.S.Code Cong. & Ad.News at 6130–31. Congress spoke frequently of section 106(a) and its application in formulating equitable remedies to deal with inactive or abandoned sites that create imminent and substantial hazards.

17. The only decision narrowly construing section 106(a) is *United States v. Wade*, 546 F.Supp.

■ The defendants argue that if CERCLA is applied retroactively then it violates the Fifth Amendment Due Process Clause. The fact that a statute has retroactive application does not make it unconstitutional. Once it has been determined that Congress intended the statute to apply retroactively, the statute is presumed constitutional.

> It is by now well established that legislative acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an *arbitrary and irrational way.*

*Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976) (emphasis added). The defendants must therefore prove that Congress acted arbitrarily and irrationally in the passage of CERCLA.

In *Turner Elkhorn Mining Co.* the defendants challenged the constitutionality of a provision in Title IV of the Federal Coal Mine Health and Safety Act of 1969, as amended by the Black Lung Benefits Act of 1972, 30 U.S.C. §§ 901 *et seq.* (1970 ed. & Supp. IV), requiring the payment of benefits with respect to miners who left employment in the industry before the effective date of the Act. The Court held the statute constitutional because Congress acted in a rational manner in formulating the provisions. *Id.* at 18, 96 S.Ct. at 2893. Indeed, "legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations [citations omitted]. This is true even though the effect of the legislation is to impose a new duty or liability based on past acts [citations omitted]." *Id.* at 16, 96 S.Ct. at 2892.

It is clear that Congress intended to have the chemical industry, past and present, pay for the costs of cleaning up inactive hazardous waste sites. 126 Cong.Rec. S14,962, S14,963 (daily ed. Nov. 24, 1980) (remarks of Sen. Randolph); *id.* at S14,966 (remarks of Sen. Stafford); *id.* at S14,972

785 (E.D.Pa.1982). In holding that section 106(a) does not apply to inactive sites, the court stated:

> In the absence of any evidence that Congress intended section 106 to be used in this way, and in face of the clear and carefully detailed legislative provision of another route to the same result [sections 104 and 107(a) ], I cannot agree with the government's contention.
>
> The language of section 106 gives no hint of an intent to confer liability on past generators. Like section 7003 of RCRA, and, significantly, unlike section 107, it is written in the present tense. It authorizes the government to seek immediate injunctive relief because of "an actual or threatened release of a hazardous substance from a facility...." A straightforward reading of this language requires that I conclude that Congress intended section 106(a) to be used in emergency situations where hazardous waste was currently being discharged or threatened to be discharged "from a facility" and where such discharge could be stopped by an injunction....

*Id.* at 793. Although this Court gave great deference to the *Wade* decision on other issues, the Court is of the opinion that the analysis in the *Wade* decision concerning section 106(a)'s application to inactive sites is inapposite to Congressional intent. First, application of section 106(a) to inactive sites is not duplicative of sections 104 and 107(a). Section 106(a) is an emergency provision, not a general cleanup provision. Congress intended section 106(a) to be used when the normal route through sections 104 and 107(a) proved to be too time consuming and cumbersome in the face of an imminent and substantial endangerment. *See infra* note 28 and accompanying text. Second, section 106(a) grants broad flexible equitable powers to the court; whereas, sections 104 and 107(a) provide specific statutory remedies for costs incurred. Third, a restrictive comparison between section 7003 of RCRA and section 106(a) is misplaced because section 106(a) was drafted by a Congress enlightened by the hindsight of the inadequacies of section 7003's application to inactive sites and the magnitude of problems caused by these sites. CERCLA was specifically enacted to address the financial and procedural problems associated with inactive or abandoned sites. Fourth, in order to give full effectiveness to CERCLA's provisions, section 106(a) must be allowed to work in tandem with sections 104 and 107(a). But for an expansive reading of section 106(a), the EPA would face similar financial problems as faced under section 7003 when abating an imminent and substantial endangerment. Finally, various other courts have declined to follow this portion of the *Wade* decision on similar grounds. *Price,* 577 F.Supp. 1103 at 1111–1114; and *Outboard Marine,* 556 F.Supp. at 57–58. *See also Reilly Tar & Chemical Corp.,* 546 F.Supp. at 1113–14.

(remarks of Sen. Tsongas); and 126 Cong. Rec. H11,799 (daily ed. Dec. 3, 1980) (remarks of Rep. Jeffords). Congress rationally considered the imposition of liability for the effects of past disposal practices as a means to spread the costs of the cleanup on those who created and profited from the waste disposal-generators, transporters, and disposal site owners/operators. *See also Georgeoff,* 562 F.Supp. at 1312; and S.Rep. No. 848, 96th Cong., 2d Sess. 12 and 33–34, *reprinted in* [1980] U.S.Code Cong. & Ad.News 6119. Accordingly, as in *Turner Elkhorn Mining Co.,* CERCLA's imposition of liability for past acts is rational and satisfies the Due Process Clause of the Fifth Amendment.[18]

Defendants contend that the provisions of CERCLA were not intended to apply retroactively to costs incurred prior to the effective date of CERCLA, December 11, 1980, 42 U.S.C. § 9652(a). The plaintiff rebuts this contention by first arguing that CERCLA specifically states that those liable under CERCLA, "shall be liable for— (A) all costs of removal or remedial action incurred by the United States Government ... not inconsistent with the national contingency plan ..." 42 U.S.C. § 9607(a); therefore, implying that defendants are liable for all costs regardless of when incurred. Second, plaintiff suggests that Congress specifically intended CERCLA be given retroactive effect to costs incurred, since Congress failed to include a provision limiting such recovery in § 9607(a). Finally, plaintiff contends that the legislative history supports retroactive application to costs incurred. Although the Court has held that CERCLA applies to past acts of generators and transporters, rendering them liable for response costs incurred in

cleaning up inactive hazardous waste sites, the prayer for response costs incurred prior to CERCLA's enactment is a separate and distinct new duty from the obligation of post-CERCLA liability for past acts.

Axiomatic, if the language of the statute is plain and unambiguous, then it controls. Section 302 of CERCLA, 42 U.S.C. § 9652 states, in pertinent part:

(a) Unless otherwise provided, all provisions of this chapter shall be effective on December 11, 1980.

(c) Any regulation—

(1) respecting financial responsibility,

(2) issued pursuant to any provision of law repealed or superseded by this chapter, and

(3) in effect on the date immediately preceding the effective date of this chapter shall be deemed to be a regulation issued pursuant to the authority of this chapter and shall remain in full force and effect unless or until superseded by new regulations issued thereunder.

(d) Nothing in this chapter shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to releases of hazardous substances or other pollutants or contaminants....

Clearly, CERCLA became effective on December 11, 1980 and does not modify financial responsibilities or duties under prior laws *unless* specifically done so by provision. The Court in *Georgeoff* previously noted that certain "provisions of CERCLA support the view that CERCLA applies to pre-enactment conduct." 562 F.Supp. at 1311. Those provisions are sections 104(c)(3), 107(f) and 111(d)(1), 42 U.S.C. §§ 9604(c)(3), 9607(f) and 9611(d)(1). The

**18.** Defendants seek to distinguish the results in *Turner Elkhorn Mining Co.* from the case at bar. These arguments are unpersuasive. As previously noted, Congress explicitly intended CERCLA to apply retroactively and the fact that the language of the provision in *Turner Elkhorn Mining Co.* explicitly stated that the provision was to be applied retroactively is of little consequence. This Court fails to discern any concert difference in reimbursement of costs incurred by the government and compensation to black

lung victims. Finally, there is no indication that strict liability under CERCLA is triggered only for the release of hazardous waste designated by the EPA. Section 101(14), 42 U.S.C. § 9601(14).

Promulgation of the hazardous waste listing by the EPA was not a prerequisite to the institution of this suit. *United States v. Reilly Tar & Chemical Co.,* 546 F.Supp. 1100, 1114–15 (D.Minn.1982).

plaintiff argues the same observations made in *Georgeoff*, 562 F.Supp. at 1311:

> CERCLA authorizes reimbursements from the Superfund for response costs arising before CERCLA's enactment, *indicating that at least some* of the provisions of CERCLA apply retroactively. Finally, the § 9607(f) prohibition on recovery for injuries to natural resources occurring before CERCLA's enactment *suggests, by implication,* that a similar prohibition does not apply to other response costs.

*Id.* (emphasis added). This Court, as the court in *Georgeoff*, 562 F.Supp. at 1311–12, concludes that the statutory language is not equivocal as to the intent of Congress. The statutory language "all costs ... incurred ..." 42 U.S.C. § 9607(a), is susceptible to varying interpretations, either all costs incurred regardless of when incurred or all costs incurred from the date of enactment. The national contingency plan makes no provision for the recovery of pre-CERCLA response costs. 40 C.F.R. Part 300 (1983). References to time limitations placed in sections 104(c)(3), 107(f) and 111(d)(1) could equally indicate that these are the only provisions in which pre-CERCLA costs may be recoverable. Most importantly, there is no clear and affirmative statement in the statute allowing for recovery of pre-enactment response costs.

The only substantive discussion of the retroactive application of CERCLA to the costs incurred is concerning the originally drafted senate version of CERCLA, S.1480, as reported out of the Senate Committee on Environmental and Public Works, 126 Cong.Rec. S.9452 (daily ed. July 21, 1980). The bill contained an amendment introduced by Senator Domenici which became section 4(n) of S.1480.[19] The Senate version contained provisions concerning liability for removal costs, section 4(a)(1), S.1480, and for other specified forms of damages, section 4(a)(2), S.1480. Section 4(n) speaks to those liability provisions under section 4(a)(2). The discussions concerning limits of liability specifically dealt with section 4(a)(2) and not section 4(a)(1). As noted by plaintiff, the Senate Report accompanying S.1480 states, "Section 4(n) specifies how claims for certain damages occurring before the date of enactment will be handled under S.1480. Costs of removal (cleanup and containment) are not affected by this provision, nor are any damages associated with continuing releases." Committee on Environmental and Public Works, S.1480. S.Rep. No. 848, 96th Cong., 2d Sess. 344 (1980). Indeed, the plaintiff quotes Senator Domenici, explaining that the purpose

---

**19.** Section 4(n) of S.1480 read, in pertinent part, as follows:

(n)(1) No person (including the United States, the Fund, or any State) may recover under the authority of this section, nor may any money in the Fund be used under Section 6 of this Act for the payment of any claim, for damages specified under subsection (a)(2)(A), (B), (C), (D), (G), or (E) (other than for loss resulting from personal injury) of this section, nor may any money in the Fund be used under section 6(a)(1)(E) or (F) of this Act, where such damages and the release of a hazardous substance from which such damages resulted have occurred wholly before the enactment of this Act.

(2) No person (including the United States, the Fund, or any State) may recover under the authority of this section, nor may any money in the Fund be used under section 6 of this Act for the payment of any claim, for damages specified under subsection (a)(2)(F) of this section (for loss of income or profits or impairment of earning capacity resulting from personal injury), where the exposure of the claimant to a release

of a hazardous substance has occurred wholly prior to January 1, 1977, and the claimant has discovered or has knowledge of his injury or disease prior to such date.

(3) No person (including the United States, the fund, or any State) may recover under the authority of this section for damages specified under subsection (a)(2)(F) of this section or under subsection (a)(2)(E) of this section (for loss of income or profits or impairment of earning capacity resulting from personal injury), where the exposure of the claimant to a release of a hazardous substance has occurred wholly prior to January 1, 1977, but the claimant has not discovered or had knowledge of this injury or disease until after such date.

\* \* \* \* \* \*

(4) For the purpose of this subsection, the costs of temporary or permanent relocation of residences and provision of alternative water supplies shall be deemed costs of removal and not damages specified in subsection (a)(2)(A) of this section.

of section 4(n), " 'is that those kinds of damages become part of causes of action or costs of removal and, therefore, are not affected by the retroactive limitations.' Transcript of Senate Committee on Environment and Public Works Mark-Up of S.1480, 194–195 (June 6, 1980)." In conclusion, plaintiff suggests that in the absence of specific limitations on liability for costs of removal or remedial actions, a party is liable for such costs regardless of when they are incurred so long as they are not shown to be inconsistent with the national contingency plan.

The legislative history is unpersuasive. Sections 4(a)(2) and 4(n) of S.1480 were essentially deleted from the enacted compromise bill. The only real reference in CERCLA to special damages concerns destruction and loss of natural resources. Sections 107(a)(4)(C) and 111(d)(1), 42 U.S.C. §§ 9607(a)(4)(C) and 9611(d)(1). As noted previously, CERCLA is not the ultimate tool intended by its sponsors. In fact, the original senate proposal, S.1480, was severely compromised by the final enactment.[20] The lone statement of Senator Domenici falls short of establishing that Congress intended to hold possibly hundreds of past transporters and generators liable for pre-CERCLA response costs, without limit in time or amount. Of equal importance is the lack of discussion in the House concerning the retroactive application of CERCLA to pre-enactment response costs.[21] Although the Court is cognizant of Congress' intent to hold the past generators and transporters liable for the costs incurred in cleaning up the results of inactive hazardous disposal sites,[22] in view of the repeated references to the millions of dollars the government and others have spent on the cleanup of inactive hazardous disposal sites prior to CERCLA and other

procedural and substantive inadequacies of pre-CERCLA statutes, it is difficult to believe that if Congress had intended to make the defendants liable for pre-CERCLA expenses, it would not have said so explicitly and clearly in the statutory language, committee reports or floor debates. *Alyeska Pipeline Service Co. v. United States*, 624 F.2d 1005, 1016, 224 Ct.Cl. 240 (1980). Although it was possible for Congress to legislate the liability of past generators and transporters for pre-CERCLA response costs, they did not, and this Court does not deem it advisable to engage in judicial legislation concerning a statute of such importance and controversy. All doubts of retroactive application must be resolved in favor of the defendants; therefore, the defendants are not liable for pre-CERCLA response costs.

### B. Standard of Liability—Strict Liability

Defendants argue that negligence should be the standard for liability under CERCLA, sections 104, 106(a) and 107(a); whereas, the plaintiff advocates a standard of strict liability. Defendants are correct in noting that CERCLA does not explicitly contain a strict liability provision and, more importantly, the specific strict liability provision contained in the original Senate bill was deleted from the statute as enacted. Presently, section 107(a), after listing the categories of liable persons, reads, "shall be liable" instead of the stricter Senate proposal which read "shall be jointly, strictly, and severally liable." S.1480, 96th Cong., 2d Sess., *reprinted in, The Environmental Emergency Response Act: Hearing Before the Senate Comm. on Finance on S.1480*, 96th Cong., 2d Sess. 5 (1980). *See also* 38 Cong.Q.Weekly Rep. 3436 (Nov. 29, 1980); and 126 Cong.Rec.

---

20. *See supra* note 15 and accompanying text.

21. *E.g.,* H.R.Rep. No. 1016, 96th Cong. 2d Sess., *reprinted in* [1980] U.S.Code Cong. & Ad.News 6119; and S.Rep. No. 172, 96th Cong., 2d Sess., *reprinted in* [1980] U.S.Code Cong. & Ad.News 5019.

22. *See Georgeoff*, 562 F.Supp. at 1312, citing statements by EPA representatives, S.Rep. No.

848, 96th Cong., 2d Sess. 98 (1980), and members of Congress, 126 Cong.Rec. S.15,003 (daily ed. Nov. 24, 1980) (statement by Sen. Chaffee); *id.* at S.14,971 (remarks of Sen. Tsongas); *id.* at S.14,971–72 (statement by Sen. Bradley; 126 Cong.Rec. H.11,799 (daily ed. Dec. 3, 1980) (remarks of Rep. Jeffords).

H11, 787 (daily ed. Dec. 3, 1980) (remarks of Rep. Florio). This Court finds that section 101(32), 42 U.S.C. § 9601(32) provides for strict liability of past non-negligent off-site generators and transporters, when it states: " 'liable' or 'liability' under this chapter shall be construed to be the standard of liability which obtains under [section 311 of the Federal Water Pollution Control Act (FWPCA) (commonly referred to as 'the Clean Water Act of 1977'), 33 U.S.C. § 1321 (1981) ]." Congress' reference to § 1321 appears quite logical since the same defenses to liability found in 42 U.S.C. § 9607(b) are also found in § 1321(f)(1). The courts have consistently construed § 1321 as a strict liability provision. *United States v. M/V Big Sam,* 681 F.2d 432 (5th Cir.1982), *on petition for rehearing and suggestions for rehearing en banc,* 693 F.2d 451 (5th Cir.1982); *United States v. LeBeouf Bros. Towing Co.,* 621 F.2d 787 (5th Cir.1980), *cert. denied,* 452 U.S. 906, 101 S.Ct. 3031, 69 L.Ed.2d 406 (1981); *Steuart Transportation Co. v. Allied Towing Corp.,* 596 F.2d 609 (4th Cir. 1979); *United States v. Tex-Tow, Inc.,* 589 F.2d 1310 (7th Cir.1978); and *Burgess v. M/V Tamano,* 564 F.2d 964 (1st Cir.1977); and *City of Philadelphia v. Stepan Chemical Co.,* 544 F.Supp. 1135, 1140 n. 4 (E.D. Pa.1982).[23] Since this Court has already concluded that section 106(a) applies to past off-site generators and transporters, as do sections 104 and 107(a), the standard for liability, strict liability, applies equally to all three sections. The Court finds the defendants can be liable under the theory of strict liability, pursuant to sections 104, 106(a) and 107(a) of CERCLA.

**23.** Such was also the intent of Congress in passing CERCLA. *See* 126 Cong.Rec. S.14,964 (daily ed. Nov. 24, 1980) (statement of Sen. Randolph, then chairman of the Senate Environment and Public Works Committee); and 126 Cong.Rec. at H.11,787 (daily ed. Dec. 3, 1980) (statement of Rep. Florio). The district court in *Price,* 577 F.Supp. 1103 at 1114, held that CERCLA requires a strict liability standard. *See generally Wade,* 546 F.Supp. at 793 n. 24; *Conservation Chemical: Generator Liability For Imminent Hazards on the Docket,* 13 E.L.R. 10208, 10210 (1983); Note, *The Comprehensive Environmental Response, Compensation and Liability Act of*

## C. Joint and Several Liability

 Defendants contend, inter alia, that liability of the parties should be based on the relative fault and causation of the parties resulting in the imminent and substantial endangerment, whereas, the plaintiff contends that liability is joint and several. As noted above the final language of Section 107(a), 42 U.S.C. § 9607(a), "shall be liable for" differs dramatically from the stricter standard imposed by Senate proposal S.1480, calling for joint and several liability. This was part of the hastily drawn compromise which resulted in the enactment of CERCLA.[24] Although explicit reference to joint and several liability was deleted from the final enactment, this Court finds that joint and several liability is at least permissible, if not mandated, under the facts of this case. Senator Jennings Randolph, stated during the debates on the compromise bill:

> We have kept strict liability in the compromise ... but we have deleted any reference to joint and several liability, relying on common law principles to determine when parties should be severally liable.
>
> It is intended that issues of liability not resolved by this act, if any, shall be governed by traditional and evolving principles of common law. An example is joint and several liability.... [T]he liability of joint tortfeasors will be determined *under common or previous statutory law.*

126 Cong.Rec. S14,964 (daily ed. Nov. 24, 1980) (emphasis added).[25] Whether the specific standard is to be found in section

*1980: Is Joint and Several Liability The Answer to Superfund?,* 18 New Eng.L.Rev. 109, 128 (1982); and *Superfund: Conscriping Industry Support for Environmental Cleanup,* 9 Ecology L.Q. 524, 540–41 (1981).

**24.** *See supra* note 15 and accompanying text.

**25.** *See also* 126 Cong.Rec. H.11,787 (daily ed. Dec. 3, 1980) (statement by Rep. Florio); and 126 Cong.Rec. S.14,967 (daily ed. Nov. 24, 1980) (statement by Sen. Stafford).

311 of FWPCA, 33 U.S.C. § 1321, as set forth in section 101(32) of CERCLA, 42 U.S.C. § 9601(32), or the common law of the states, the Court finds to be an oversight of statutory and legislative guidance. The congressional statements, as noted above, could lead to both. Granted this issue may be of pinnacle importance in cases involving numerous generators, transporters, site owners and a different state's law; however, the Court deems it unnecessary to address this issue under the facts of the case at bar, which involve one generator, one transporter and one landowner in the State of Missouri. The Court concludes that the imminent and substantial endangerment posed by the Denney farm site was the act of the defendants working in concert to produce a single indivisible harm and they are therefore jointly and severally liable for the response costs incurred by the plaintiff, and for which plaintiff is entitled to recover. Under this finding, the defendants would be jointly and severally liable pursuant to the law of Missouri. *Stafford v. Muster*, 582 S.W.2d 670, 677 (Mo. en banc 1979). Section 311 of FWPCA, 33 U.S.C. § 1321, has also been construed to allow joint and several liability. *See United States v. M/V Big Sam*, 681 F.2d 432, 438–39 (5th Cir.1982), *on petition for rehearing and suggestions for rehearing en banc*, 693 F.2d 451 (5th Cir. 1982); *United States v. Hollywood Marine, Inc.*, 519 F.Supp. 688, 692 (S.D.Tex. 1981); and *United States v. Bear Marine Services*, 509 F.Supp. 710, 718–19 (E.D.La. 1980).[26]

**26.** For a thorough discussion of the policy arguments favoring joint and several liability, *see* R.M. Hall, Jr., *The Problem of Unending Liability for Hazardous Waste Management*, 38 Bus.Law 593, 603–604 (1983); *Conservation Chemical: Generator Liability for Imminent Hazards on the Docket*, 13 E.L.R. 10208, 10211–15 (1983); Note, *The Comprehensive Environmental Response, Compensation and Liability Act of 1980: Is Joint and Several Liability the Answer to Superfund?*, 18 New Eng.L.Rev. 109 (1982); and Note, *Allocating the Costs of Hazardous Waste Disposal*, 94 Harv.L.Rev. 584 (1981).

As a subsidiary issue, defendants argue that the action must be dismissed for failure to join an indispensable party, James Denney, owner of

*D. Imminent and Substantial Endangerment—Section 106(a), 42 U.S.C. § 9606(a)*

Plaintiff bases this action, in part, on section 106(a) of CERCLA, 42 U.S.C. § 9606(a), which states, in pertinent part:

(a) Maintenance, jurisdiction, etc.

... when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and the district court of the United States ... shall have jurisdiction to grant such relief as the public interest and the equities of the case may require....

The listings of hazardous waste include: 2,4,5-Trichlorophenol (TCP)-U230; Hexachlorophene-U-132; Toluene-U220; and 1,2,4,5-Tetrachlorobenzene (TCB)-U-207. 40 C.F.R. Part 261 (1980) and 40 C.F.R. Part 300 (1982). The Court finds that these compounds and 2,3,7,8-tetrachlorodibenzo-p-dioxin (dioxin or TCDD) are hazardous wastes within the meaning of 42 U.S.C. § 6903(5) and 42 U.S.C. § 9601(14). This finding is based upon the high toxicity of these compounds at relatively low dosage levels, as noted in this Court's initial findings of fact.

the Denney farm site, pursuant to Fed.R.Civ.P. 19. The Court finds this argument without merit. Neither RCRA, nor CERCLA, designate the landowner as an indispensable party. Although the Denney farm site is the subject matter of this suit, this Court finds that the defendants' interests were not prejudiced by the non-inclusion of Denney in this suit. Denney appeared and testified at trial for the plaintiff. The defendants had equal opportunity to make Denney a party, but chose not to do so. The Court also concurs with the statement found in *Austin v. Unarco Industries, Inc.*, 705 F.2d 1, 5 (1st Cir. 1983), "Joint tortfeasors are not considered indispensable parties under federal law (citations omitted)."

Although the phrase "imminent and substantial endangerment" lacks specific definition in CERCLA, this Court is not without guidance in its query. Section 106(a) is one of several imminent hazard provisions included in environmental statutes by Congress.[27] The standard for the application of section 7003 is a case-by-case assessment of the relationship between the magnitude of risk and harm arising from the presence of the hazardous waste.[28] The Court finds that the plaintiff has met its burden of proof, the Denney farm site presented an imminent and substantial endangerment to health and the environment. The quantities of dioxin and other compounds found at the Denney farm site were highly toxic at low dosage levels and given the conditions of the soil and bedrock beneath the site, there was a substantial likelihood of human and environmental exposure.

### III. Liability of the Defendants

▇▇ Having found that there was a release and a threat of continued release of hazardous waste from the Denney farm site that constituted an imminent and substantial endangerment to health and the environment, the Court will address the issue of whether the defendants are persons liable under sections 104, 106(a) and 107(a), 42 U.S.C. §§ 9604, 9606(a) and 9607(a). Each defendant will be dealt with separately.

### Mills

Defendant Mills was an independent contractor who contracted with representatives of NEPACCO to transport the hazardous waste from their facility to the Denney farm site. Defendant Mills had previously selected the Denney farm site and contract-

---

**27.** *See supra* note 6 and accompanying text.

**28.** The only substantive legislative discussion of "imminent and substantial endangerment", as noted in *United States v. Reilly Tar & Chemical Corp.*, 546 F.Supp. 1100, 1109–11 (D.Minn.1982), is found in the House Committee Report accompanying section 1431 of the Safe Water Drinking Act; wherein, it is stated:

"[I]mminence" must be considered in light of the time it may take to prepare administrative orders or moving papers to commence and complete litigation and to permit issuance, notification, implementation, and enforcement of administrative or court orders to protect the public health.

Furthermore, while the risk of harm must be "imminent" for the Administrator to act, the harm itself need not be. Thus, for example, the Administrator may invoke this section when there is an imminent likelihood of the introduction into drinking water of contaminants that may cause health damage after a period of latency.

Among those situations in which the endangerment may be regarded as "substantial" are the following:

(1) a substantial likelihood that contaminants capable of causing adverse health effects will be ingested by consumers if preventive action is not taken;

(2) a substantial statistical probability that disease will result from the presence of contaminants in drinking water; or

(3) the threat of substantial or serious harm (such as exposure to carcinogenic agents or other hazardous contaminants....)

H.R.Rep. No. 1185, 93rd Cong., 2d Sess. 35–36, *reprinted in* [1974] U.S.Code & Cong.Ad.News 6454, 6487–88. This standard had been analyzed and summarized by various courts in applying emergency environmental statutes. *See United States v. Hardage*, No. 80–1031–W, slip op. at 3–4 (W.D.Okl.1980) (RCRA-"imminency of a hazard does not depend on the proximity of the final effect but may be proven by the setting in motion of a chain of events which could cause serious injury" (citation omitted)); *Environmental Defense Fund, Inc. v. Lamphier*, 12 E.L.R. 20843, 20844 (E.D.Va.1982) (CERCLA-"There is no requirement that protective measures be limited to actions taken after a crisis has arisen or a catastrophic disaster has struck," (citation omitted)); *United States v. Vertac Chemical Corp.*, 489 F.Supp. 870, 876 (E.D.Ark. 1980) (two factors must be considered in evaluating the request for relief: the toxicity of small concentrations of the substance and the likelihood that there will be human or environmental exposure); *Reserve Mining Co. v. EPA*, 514 F.2d 492, 529 (8th Cir.1975) (en banc) (endangering the health or welfare of persons includes potential as well as actual harm); *Ethyl Corp. v. EPA*, 541 F.2d 1, 13 (D.C.Cir.1976) (en banc), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976) ("endanger means something less than actual harm"); and *Environmental Defense Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 597 (D.C.Cir.1971) ("a hazard may be 'imminent' even if its impact will not be apparent for many years"). For a thorough discussion of RCRA's section 7003 standard, "imminent and substantial," see *Using RCRA's Imminent Hazard Provision in Hazardous Waste Emergencies*, 9 Ecology L.Q. 599, 604–07 (1981).

ed with James Denney to deposit the hazardous waste at a specific price. The Court finds that defendant Mills is strictly liable pursuant to sections 101(26), 104, 106(a) and 107(a)(4), 42 U.S.C. §§ 9601(26), 9604, 9606(a) and 9607(a)(4) as a transporter of hazardous waste. Defendant Mills was not represented at trial by counsel and did not allege or prove the existence of any defense to liability. Section 107(b), 42 U.S.C. § 9607(b).

### NEPACCO

NEPACCO is the corporate entity that contracted through corporate representatives with defendant Mills for the transport and disposal of the hazardous waste at the Denney farm site. NEPACCO is a "person" as defined by section 101(21), 42 U.S.C. § 9601(21), and is therefore strictly liable for the Denney farm site cleanup pursuant to sections 104, 106(a) and 107(a)(1) and (3), 42 U.S.C. §§ 9604, 9606(a) and 9607(a)(1) and (3). *See Apex Oil Co. v. United States*, 530 F.2d 1291 (8th Cir.1976) (construing 33 U.S.C. § 1321). The Court finds that NEPACCO. failed to prove any defense to liability. Section 107(b), 42 U.S.C. § 9607(b).

### Lee

Defendant Lee, vice president of NEPACCO and immediate supervisor of the Verona facility, was directly responsible for arranging the disposal and transport of the hazardous waste at the Denney farm site. Defendant Lee had direct knowledge and supervision of the contract with defendant Mills and the ultimate disposal site. Defendant Lee assisted in the selection of the Denney farm site by instructing defendant Mills on the disposal site characteristics favorable for hazardous waste disposal.

Defendant argues correctly that corporate officers are normally not personally liable for acts of the corporate entity. Specifically, the defendant contends that he neither owned nor possessed the hazardous waste, since technically the corporate entity, NEPACCO, had the ownership rights to the hazardous waste. In addition, at trial the defendant alleged that the hazardous waste substance contained in the barrels

dumped at Denney farm site was actually manufactured by Hoffman-Taff as a by-product of their agent orange process. Several of the barrels containing the Hoffman-Taff wastes were left at the facility when NEPACCO leased the property. These barrels were subsequently placed in the northwest storage site along with those barrels containing waste from NEPACCO. The Court finds these arguments of little significance to the imposition of liability. Defendant Lee had actual knowledge of the Hoffman-Taff drums and their storage at the northwest storage site. First, defendant Lee possessed the barrels of hazardous wastes within the meaning of section 107(a)(3). As previously noted he had direct supervision and knowledge of the disposal of these barrels. Second, the person arranging for the disposal of the hazardous waste is not required to actually own or possess the hazardous waste. Section 107(a)(3) states:

> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter to transport for disposal or treatment, of hazardous substances *owned or possessed* by such *person, by any other party or entity, at any facility owned or operated by another party or entity* and containing such hazardous substances....

42 U.S.C. § 9607(a)(3). The provision clearly states that the person arranging for the disposal is not required to actually own or possess the hazardous waste or the facility from which it is moved for disposition. Since defendant Lee arranged for the disposal and transport of the hazardous waste, he is liable under section 107(a)(3), regardless of whether he actually owned or possessed the hazardous waste substance or facility. Defendant Lee is a "person" within the definition found in section 101(21), 42 U.S.C. § 9601(21). An analogous situation was dealt with by the Eighth Circuit in *Apex Oil Co. v. United States*, 530 F.2d 1291 (8th Cir.1976), construing the statutory language of 33 U.S.C. § 1321(b)(5) and (6). The Court held in

*Apex Oil Co.* that a "person in charge" can include both the individual employee and the corporation. Although the issue in *Apex Oil Co.* was whether an owner-operator (the corporation in that case) could be held liable as a "person in charge," *Id.* at 1292–93, this Court considers the Eighth Circuit's analysis significant in defining an employee's liability under CERCLA:

> Section 1321(b)(5) speaks in terms of any person in charge. We note that it would not be inconsistent with the statutory language to hold both the employee and the corporation to its penaliies [sic] for failure to report a spill.

*Id.* at 1293 n. 6. "Person" as defined in 33 U.S.C. § 1321(a)(7) is almost identical to the definition of "person" in 42 U.S.C. § 9601(21). This Court finds that a "person" arranging for the disposal of hazardous substance should be given a liberal interpretation that may include both the employee and corporation. Defendant Lee, acting as an employee, had the responsibility to and did arrange for the disposal of the hazardous waste pursuant to 42 U.S.C. § 9607(a)(3).

▆▆▆ Finally, due to defendant Lee's unique position as both vice president in charge of the Vernon plant and as a major stockholder, actively participating in NEPACCO's management, he can be classified as both an owner and operator of the NEPACCO plant, pursuant to section 107(a)(1), 42 U.S.C. § 9607(a)(1). 42 U.S.C. § 9601(20)(A) states that an "owner or operator":

> means ... (ii) in the case of an onshore facility or an offshore facility, any person owning or operating such facility....

Such term does not include a person, who, without participating in the management of a ... facility, holds indicia of ownership primarily to protect his interest in the ... facility....

The statute literally reads that a person who owns interest in a facility and is actively participating in its management can be held liable for the disposal of hazardous waste.[29] Such a construction appears to be supported by the intent of Congress. CERCLA promotes the timely cleanup of inactive hazardous waste sites. It was designed to insure, so far as possible, that the parties responsible for the creation of hazardous waste sites be liable for the response costs in cleaning them up.[30] Congress has determined that the persons who bore the fruits of hazardous waste disposal also bear the costs of cleaning it up. The Eighth Circuit adopted the definition given "owner or operator", 33 U.S.C. § 1321(a)(6), by the Fifth Circuit in *United States v. Mobil Oil Corporation,* 464 F.2d 1124, 1127 (5th Cir.1972):

> *The owner-operator of a vessel or a vacility [sic] has the capacity to make timely discovery of oil discharges. The owner-operator has power to direct the activities of persons who control the mechanisms causing the pollution. The owner-operator has the capacity to prevent and abate damage.* Accordingly, the owner-operator of a facility governed by the WPCA, such as the Mobil facility here, must be regarded as a "person in charge" of the facility for the purposes of § 1161. A more restrictive interpretation would frustrate congres-

---

**29.** An employee of a corporation can be personally liable for activities over which he had direct control and supervision. Defendant Lee, along with defendant Michaels, owned and operated the NEPACCO plant. Both were actively involved in the planning and implementation of NEPACCO's disposal practices. *See Escude Cruz v. Ortho Pharmaceutical Corp.,* 619 F.2d 902, 907 (1st Cir.1980) (employee was the "guiding spirit" or "central figure" in the corporate activity); *Marks v. Polaroid Corp.,* 237 F.2d 428, 435 (1st Cir.1956) (closely held corporation with officers who were both officers and shareholders); *Rohm and Haas Co. v. Dawson Chemical Co.,*

*Inc.,* 557 F.Supp. 739, 818–19 (S.D.Tex.1983); and *Chanel Industries, Inc. v. Pierre Marche, Inc.,* 199 F.Supp. 748 (E.D.Mo.1961).

From the language of the statute either an owner or operator or both can be held liable. In some circumstances these parties may be the same or separate and distinct persons.

**30.** *See Waste Industries,* 556 F.Supp. at 1316; *Georgeoff,* 562 F.Supp. at 1312 and the Congressional statements cited therein. *See also* H.R. 1016, *supra,* at 1, *reprinted in* [1980] U.S.Code Cong. & Ad.News at 6119.

sional purpose by exempting from the operation of the Act a large class of persons who are uniquely qualified to assume the burden imposed by it.

\* \* \* \* \* \*

*Apex Oil Co.*, 530 F.2d at 1293 (emphasis added). Defendant Lee had the capacity to control the disposal of hazardous waste at the NEPACCO plant; the power to direct the negotiations concerning the disposal of wastes at the Denney farm site; and the capacity to prevent and abate the damage caused by the disposal of hazardous wastes at the Denney farm site. Finally, Lee was a major stockholder in NEPACCO and actively participated in the management of NEPACCO in his capacity as vice-president. The Court finds that the evidence presented is sufficient to impose liability on Lee as an "owner and operator" pursuant to section 107(a)(1), 42 U.S.C. § 9607(a)(1). To hold otherwise and allow Lee to be shielded by the corporate veil "would frustrate congressional purpose by exempting from the operation of the Act a large class of persons who are uniquely qualified to assume the burden imposed by [CERCLA]." *Id.*

### Michaels

Michaels was present and supervised the construction and operation of the Verona plant for one year (1970) prior to returning to his home state, Connecticut. He was not present at the Verona plant during the disposal of hazardous waste at the Denney farm site. Michaels made frequent visits to the Verona plant in order to check on its operations. Although defendant Lee frequently reported to Michaels concerning the plant's operations, the plaintiff failed to establish that Michaels had prior direct knowledge of the proposed plan to dispose of hazardous wastes at the Denney farm site. Michaels was aware of and actively participated in previous negotiations concerning the disposal of hazardous waste with Rollins-Purle and IPC. It was not established whether NEPACCO was under contract with IPC at the time of the Denney farm disposal. Michaels was aware of the dangers resulting from exposure to dioxin and other hazardous substances. Michaels and defendant Lee were very concerned about establishing and maintaining safety precautions against exposure to these substances. Michaels was the founder and president of the NEPACCO operation in Verona, as well as, a major stockholder in the corporation. Michaels had the capacity and general responsibility as president to control the disposal of hazardous waste at the NEPACCO plant; the power to direct the negotiations concerning the disposal of wastes at the Denney farm site; and the capacity to prevent and abate the damage caused by the disposal of hazardous wastes at the Denney farm site. *See Apex Oil Co.*, 530 F.2d at 1293, quoting with favor *United States v. Mobil Oil Corp.*, 464 F.2d 1124, 1127 (5th Cir.1972). In view of these factors, the Court finds that defendant Michaels is strictly liable as an "owner and operator" of the Verona facility for the response costs incurred pursuant to section 107(a)(1), 42 U.S.C. § 9607(a)(1). Michaels satisfies all the requirements of an "owner or operator" under 42 U.S.C. § 9601(20)(A) and (21). The same policy considerations expressed by Congress holding defendant Lee liable would also necessitate the imposition of liability on Michaels.[31]

Since this Court has previously found that the list of parties and response costs in section 107(a) are to be applied in determining liability under section 106(a), all four defendants are jointly and severally liable for those response costs incurred

---

**31.** *See supra* notes 29–30 and accompanying text.

This Court having found defendant Michaels liable pursuant to section 107(a)(1) does not deem it necessary to determine his liability pursuant to section 107(a)(3) as a "person" who arranged for the disposal of hazardous waste at the Denney farm site. Since Congress has determined that owners and operators of a facility from which hazardous wastes are disposed are to be strictly liable, subject to only four defenses, the question of whether Michaels actually arranged for the disposal is moot.

pursuant to section 106(a), 42 U.S.C. § 9606(a).

## IV. Recoverable Response Costs

■ The final issue is to determine the response costs for which the defendants are liable under sections 104, 106(a) and 107(a). Section 107(a)(4)(A) states that the parties shall be liable for, "all costs of removal or remedial action incurred by the United States ... not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(A). Section 106(a) grants this Court the power to provide "such relief as may be necessary to abate such danger or threat" caused by the hazardous waste site and "such relief as the public interest and the equities of the case may require." 42 U.S.C. § 9606(a). Since this Court has previously concluded that the defendants are not liable under section 7003 of RCRA and that liability under CERCLA does not apply to response costs incurred prior to its enactment, the defendants' liability is limited to those response costs incurred after December 10, 1980. Plaintiff seeks recovery of response costs incurred, including attorney fees, prejudgment interest and a declaratory judgment for future response costs.

With regard to the government's response costs incurred, these activities would include:

(a) Investigations, monitoring and testing to identify the extent of danger to the public health or welfare or the environment.

(b) Investigations, monitoring and testing to identify the extent of the release or threatened release of hazardous substances.

(c) Planning and implementation of a response action.

(d) Recovery of the costs associated with the above actions, and to enforce the provisions of CERCLA, including the costs incurred for the staffs of the EPA and the Department of Justice.

■ The language of CERCLA confirms that the government has very broad cost recovery rights. The fact that there is not a claim before this Court seeking recovery on behalf of the fund does not bar recovery by the plaintiff. An action brought pursuant to sections 106(a) and 107(a) are independent and separate of the provisions authorizing use of the Superfund, sections 104(c)(3) and 111. The plaintiff is not required to present a claim to the fund, nor enter into a cooperative agreement with the state of Missouri, prior to bringing suit under sections 106(a) and 107(a). *Georgeoff,* 562 F.Supp. at 1315; and *Reilly Tar & Chemical Co.,* 546 F.Supp. at 1117–18. The language of section 107(a) makes this finding explicitly clear, "Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of the section...."

Defendants argue that the plaintiff failed to prove that the costs incurred were reasonable and "not inconsistent with the national contingency plan." Initially, the Court finds that the burden of proving inconsistency with the national contingency plan was that of the defendants. This conclusion is evident from the language of the statute. To give meaning to every term in the statute, the Court reads the insertion of the word "not" immediately prior to "inconsistent" to mean that the defendants are presumed liable for all response costs incurred *unless* they can overcome this presumption by presenting evidence of inconsistency. The content of section 107(a)(4)(B) lends support to this conclusion in stating that responsible parties are liable for "any other costs of response incurred by any other person *consistent with* the national contingency plan...." (emphasis added). On its face, section 107(a)(4)(B) intends that a different standard apply to cost recovery by nongovernmental entities and that such entities must affirmatively show that their actions were consistent. Clearly, the standard as set forth by section 107(a)(4)(A) is that the costs incurred must be "not inconsistent with the national contingency plan." Apparently, Congress considered the different standards and specifically set forth that nongovernmental entities must prove their costs incurred were

both "necessary" and "consistent," section 107(a)(4)(B), and that costs incurred due to assessing the injury, destruction, or loss of natural resources be "reasonable," section 107(a)(4)(C). Congress has already made provision for the reasonableness of the actions taken by the government. Section 105, 42 U.S.C. § 9605, mandated that a national contingency plan be published and that statute explicitly sets forth the guidelines governing the formulation of the procedures and standards for responding to releases of hazardous substances. Once the national contingency plan was published, Congress stated that "the response to and actions to minimize damage from hazardous substance releases shall, *to the greatest extent possible*, be in accordance with the provisions of the plan." Section 105, 42 U.S.C. § 9605 (emphasis added). Reasonableness is conclusively presumed to have been built into the plan since one of the guidelines expressed by Congress was that the plan provide a "means of assuring that remedial action measures are cost-effective over the period of potential exposure...." Section 105(7). As long as the actions taken by the government were in harmony with the national contingency plan, the costs incurred pursuant to those actions are presumed to be reasonable and therefore recoverable. If Congress had intended otherwise, they would have merely stated in section 107(a)(4)(A), "all reasonable costs," instead of the present language of "all costs." [32] The Court finds that the defendants have failed to prove that the costs incurred by the government were inconsistent with the national contingency plan. In addition, a review of the remedial and removal actions taken by the government leads this Court to conclude that such actions were consistent with the national contingency plan. 40 C.F.R. Part 300 (1982).

The defendants argue that the government cannot recover the attorney fees incurred in the prosecution of this action. It is well settled law that a party cannot recover attorney fees unless provided for by contract or statute. *Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. 240, 262, 95 S.Ct. 1612, 1624, 44 L.Ed.2d 141 (1975); *Bagby v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 491 F.2d 192 (8th Cir.1973); and *City of Grandview v. Hudson*, 377 F.2d 694 (8th Cir.1967). The Court finds that CERCLA specifically allows for the recovery of attorney fees. Under CERCLA section 107(a)(4)(A), 42 U.S.C. § 9607(a)(4)(A), responsible parties are liable for "all costs of removal or remedial action...." Section 101(23) defines "remove" or "removal" to mean, inter alia, "action taken under section 9604(b)...." 42 U.S.C. § 9601(23). Section 104(b) states, in pertinent part:

> Whenever the President is authorized to act pursuant to subsection (a) of this section ... [he] may undertake such *planning, legal*, fiscal, economic, engineering, architectural, and *other studies or investigations* as he may deem necessary or appropriate *to plan and direct response actions, to recover the costs thereof, and to enforce the provisions of this chapter.*

42 U.S.C. § 9604(b) (emphasis added). Accordingly, since the plaintiff acted pursuant to section 104(a), the Court finds that under CERCLA, the defendants are jointly and severally liable for, and the plaintiff is entitled to recover, all litigation costs, including attorney fees, incurred by plaintiff. The Court further finds that the defendants are jointly and severally liable to the plaintiff for all costs, including salaries and expenses,[33] incurred by plaintiff associated with such activities as monitoring, assess-

**32.** *See Burgess v. M/V Tamano*, 564 F.2d 964, 993 (1st Cir.1977), *cert. denied*, 435 U.S. 941, 98 S.Ct. 1520, 55 L.Ed.2d 537 (1978); and *Commw. of Puerto Rico v. SS Zoe Colocotroni*, 456 F.Supp. 1327, 1347 (D.P.R.1978), *aff'd*, 602 F.2d 12 (1st Cir.1979), construing 33 U.S.C. §§ 1321(f)(1) and (2) of FWPCA, respectively, shall be liable to the United States for "the

actual costs incurred", not to require a showing of reasonableness. *See also United States v. Beatty, Inc.*, 401 F.Supp. 1040, 1045 (W.D.Ky. 1975).

**33.** *See United States v. Hollywood Marine, Inc.*, 519 F.Supp. 688, 692 (S.D.Tex.1981); and *United States v. Slade, Inc.*, 447 F.Supp. 638, 645 (E.D.

ing and evaluating the release of contaminants and the taking of actions to prevent, minimize or mitigate damage which might result from a release or threat of release of contaminants from the Denney farm site.

■ Plaintiff seeks the award of prejudgment interest. In the absence of statutory provision the granting of prejudgment interest lies within the discretion of the Court. *Mid-America Transportation Co., Inc. v. Rose Barge Line, Inc.,* 477 F.2d 914 (8th Cir.1973); and *Bricklayers' Pension Trust Fund v. Taiariol,* 671 F.2d 988 (6th Cir.1982). Although CERCLA does not specifically address the issue of prejudgment interest, the Court finds the Sixth Circuit's analysis in *Bricklayers' Pension Trust Fund v. Taiariol* of assistance, in stating:

> In the absence of legislative direction, the Supreme Court, again in [*Rodgers v. United States,* 332 U.S. 371, 68 S.Ct. 5, 92 L.Ed.3 (1947)], directed that the decision to grant or deny prejudgment interest should hinge on whether to do so would further the congressional purposes underlying the obligations imposed by the statute in question. 332 U.S. at 373, 68 S.Ct. at 6.

*Bricklayers' Pension Trust Fund,* 671 F.2d at 989. In determining this issue, the Court must be mindful of the Congressional intent to impose liability on those responsible parties for "all costs" incurred in taking remedial and removal action. It was the intent of Congress that CERCLA be given a broad interpretation so as not to restrict the liability of those responsible parties. It is also well established that prejudgment interest is compensatory in nature, not punitive. An award of prejudgment interest is not foreign to actions involving environmental statutes. *United States v. M/V Zoe Colocotroni,* 602 F.2d 12, 14 (1st Cir.1979); *United States v. Hollywood Marine, Inc.,* 519 F.Supp. 688 (S.D. Tex.1981); and *United States v. Malitovsky Cooperage Co.,* 472 F.Supp. 454, 458 (W.D.Pa.1979). Considering the intent of Congress and the equities involved in this

case, the Court finds the defendants jointly and severally liable to plaintiff for prejudgment interest at the rate of 9% per annum which is in accordance with Missouri's postjudgment interest statute, V.A.M.S. § 408.-040. The interest shall be calculated from August 19, 1982, the date the amended complaint was filed. The original complaint was filed August 1, 1980 pursuant to section 7003 of RCRA. Since the Court has held the defendants not liable under section 7003, it would not be appropriate to calculate interest from August 1, 1980. Although the defendants are liable for response costs incurred past December 10, 1980, the Court is unaware of a demand on the defendants for the response costs pursuant to CERCLA prior to the filing of the amended complaint on August 19, 1982.

■ The plaintiff filed a motion for a declaratory judgment pursuant to Fed.R. Civ.P. 57 seeking entitlement to recover its future response costs associated with the Denney farm site. Granting declaratory relief is within the discretion of the Court. C. Wright, A. Miller & Kane, *Federal Practice and Procedure,* § 2759 (2d ed. 1983). The Court finds that granting plaintiff declaratory relief would be of benefit to all parties concerned. The issues have been firmly established and there is a real, present controversy between the plaintiff and defendants. While the Court cannot award costs until they are incurred, the Court can presently determine liability for future costs. *Georgeoff,* 562 F.Supp. at 1315. Plaintiff established that it has already incurred thousands of dollars in costs and has proven that it expects to incur future costs in monitoring and assessing the maintenance of hazardous waste at the Denney farm site. Accordingly, the Court concludes that the defendants are jointly and severally liable for all future costs of removal or remedial action incurred by the plaintiff relative to the Denney farm site that are not inconsistent with the national contingency plan.

Accordingly, for the reasons above, it is hereby

---

Tex.1978), construing "the actual costs incurred", 33 U.S.C. § 1321 of FWPCA, to include

all saláries of the agencies' employees and expenses.

ORDERED that judgment is granted in favor of defendants on Count I of the amended complaint; and it is further

ORDERED that plaintiff's motion for declaratory relief is granted and therefore the defendants are jointly and severally liable for all future costs of removal or remedial action incurred by the plaintiff relative to the Denney farm site that are not inconsistent with the national contingency plan; and it is further

ORDERED that the plaintiff shall within thirty (30) days from the entry of this order submit an itemization of the costs incurred by plaintiff after December 10, 1980, at which time the defendants shall be granted twenty (20) days to respond to the plaintiff's itemization of costs incurred; and it is further

ORDERED that defendants' motion to strike plaintiff's reply brief is granted; and it is further

ORDERED that upon a determination of the amounts which plaintiff is entitled to recover, judgment will be entered in favor of plaintiff and against defendants on Counts II and III of the amended complaint.